**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **T.H.E. INSURANCE COMPANY,** | : | |
| | : | |
| **Plaintiff** | : | |
| **VS.** | : | **3:CV-04-1652** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **CHARLES BOYER CHILDREN'S TRUST** | : | |
| **D/B/A BOYER'S WESTWOOD LANES,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff T.H.E. Insurance Company ("TIC") seeks a declaratory judgment that the insurance policy it issued to Defendant Charles Boyer Children's Trust D/B/A Boyer's Westwood Lanes does not cover the mud and water damage to its bowling alley following a heavy rainstorm.  TIC contends that it is not obligated to cover the loss by reason of the policy's earth movement and water exclusions.

Presently before the Court are the motion for summary judgment filed by TIC and the motion for partial summary judgment filed by Defendant.  (Dkt. Entries 21, 24.)  Because the damage at issue in this case is excluded by the surface water exclusion, TIC's motion for summary judgment will be granted, and the motion for summary judgment of Defendant will be denied.

I.   **BACKGROUND**[1]

Defendant owns a bowling alley in Pottsville, Pennsylvania.  (Def.'s Statement of

Material Facts ("SMF"), Dkt. Entry 26, ¶ 2.)  During the night of July 11, 2004, a heavy

rainstorm struck the Pottsville area.  (Id., at ¶ 1.)  In the early hours of July 12, 2004,

Defendant's bowling alley suffered substantial damage from mud and water that flowed in when

a door on the east side of the property collapsed.  (Id., at ¶ 2.)   Evidence of water and mud

was measured at 42 inches above the floor inside the building, and 51 inches above the ground

surface outside the building.  (NFC Report, Dkt. Entry 22, Ex. C, at 4.)  Though the actual

amount is in dispute, Defendant estimates the damage to be approximately $2,000,000.  (Pl.'s

Response to Def.'s SMF ("Pl.'s Response"), Dkt. Entry 28, at ¶ 3.)

At some point during the night of July 11-12, 2004, the embankment to the south of the

bowling alley collapsed, leaving an open hole approximately 12 feet in width and 30 feet in

---

[1] Much of the uncontradicted factual background is found in the parties' Statements of
Material Facts and responses (Dkt. Entries 21, 26, 28), filed in accordance with Local Rule of
Court 56.1.  Under Local Rule 56.1, a party moving for summary judgment must file a
"separate, short and concise statement of material facts, in numbered paragraphs, as to which
the moving party contends there is no genuine issue to be tried."  A party opposing a summary
judgment motion must respond to the numbered paragraphs in the moving party's statement of
material fact.  Both the movant's and the opponent's statements of material facts must contain
references to the record to support their respective assertions.  "All material facts set forth in
the statement required to be served by the moving party will be deemed admitted unless
controverted by the statement required to be served by the opposing party."  As the parties
have complied with Local Rule 56.1, their Local Rule 56.1 Statements will be cited where
appropriate.  For matters that are not admitted in the Local Rule 56.1 Statements, the
appropriate part of the record that supports a factual assertion will be cited.

length. The collapse was caused by the failure of a 36-inch corrugated metal sewer pipe buried in the embankment.  The sewer pipe ruptured at the collar of its joints.  Defendant asserts that the pipe ruptured because the metal bands that connected the pipe's joints were loosely fitted, while Plaintiff contends that the pipe was running over capacity.  (NFC Report, Dkt. Entry 22, Ex. C, at 6-9; Quad3 Report, Dkt. Entry 22, Ex. E, at 5.)

Water from the ruptured pipe weakened the earth material of the embankment, resulting in the collapse of the embankment.  The  collapse deposited earth material at the foot of the embankment, creating a mud pile by the concrete wall that separated the bowling alley and the embankment.  This accumulation of debris diverted the normal flow of water established for drainage purposes.  The water instead flowed towards a low area on the east side of the building, where the water rose to an estimated height of 51 inches.

TIC contends that surface water from the east parking lot and from the grassed area between the building and the parking lot also contributed to the flooding of the low area on the east side.  (NFC Report, Dkt. Entry 22, Ex. C, at 9.)  Defendant in turn asserts that the only surface water that contributed to the damage would have come from the low area and its surrounding areas, and that surface water from the parking lot did not significantly contribute to the loss. (Quad3 Report, Dkt. Entry 22, Ex. E, at 5.)  Both sides agree, however, that the pressure of accumulated water and mud ultimately forced open the door on the east side of the building.

3

Defendant had a Commercial Lines insurance policy with TIC (the "Policy") that insured the bowling alley's building, personal property and business income.  (Compl. for Declaratory J., Dkt. Entry 1, at ¶¶ 5,7.)  Defendant's policy essentially was an all-risk policy, providing coverage for all risks of loss unless specifically excluded.  (Def.'s SMF, Dkt. Entry 26, at ¶ 7; Oral Argument Tr., Dkt. Entry 32, at 5-6.)

Defendant filed a claim with TIC under the Policy for the loss to the bowling alley. (Def.'s SMF, Dkt. Entry 26, at ¶ 6.)  Defendant asserted that the damage to the property was covered by the Policy's provisions concerning "collapse," which is defined in the Policy to mean "an abrupt falling down or caving in of a building or any part of a building . . . ." (Policy, Dkt. Entry 22, Ex. A, at 34.)  Defendant argued that the damage to the bowling alley was caused by the caving in, i.e., collapse, of the door.

TIC rejected coverage on this basis because the Policy affords coverage only if the collapse was due to specifically identified causes, and the door was not knocked down by any of the enumerated causes.  TIC also denied the claim on the ground that the damage to Defendant's bowling alley was caused, at least in part, by "earth movement" or "water" within the meaning of the Policy exclusions.  (Pl.'s Response, Dkt. Entry 28, at ¶ 20.)

Relative to damage caused by earth movement and water, the Policy provides:

> We will not pay for loss or damage **caused directly or indirectly** by any of the following.  **Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss**.

4

b. Earth Movement

(2) Landslide, including any earth sinking, rising or shifting related to such event.

. . .

(4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty.  Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

. . .

g. Water

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
(2) Mudslide or mud flow;
(3) Water that backs up or overflows from a sewer, drain or sump

(Policy, Dkt. Entry 22, Ex. A, at 29-30; emphasis added.)

On July 27, 2004, TIC filed a Complaint for Declaratory Judgment.  (Dkt. Entry 1.)  An Amended Complaint was filed on September 28, 2004.  (Dkt. Entry 9.)  Defendant filed an Answer with Counterclaim, asserting (a) entitlement to coverage; (b) bad faith liability under 42 Pa. C.S.A. §8371; and (c) fraud.  (Dkt. Entry 10.)  On August 25, 2005, following completion of discovery, TIC filed a Motion for Summary Judgment.  (Dkt. Entry 21.)  On September 7, 2005, Defendant filed a Cross Motion for Partial Summary Judgment.  (Dkt. Entry 24.)  The Court heard oral argument on the dispositive motions on February 10, 2006.

## II.     DISCUSSION

### A. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under applicable law.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986).  "Facts that could alter the outcome are material facts." Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 329 (1986).  All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988); Continental Ins. Co. v. Bodie, 682 F.2d 436 (3d Cir. 1982).  Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment."  Anderson, 477 U.S. at 256-57.  Mere conclusory allegations or denials taken from

the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials.  Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

###### B.  Insurance Policy Interpretation Principles

Because this is a diversity action, Pennsylvania substantive law applies in construing the language of the insurance policy.  Erie R.R. Co. V. Tompkins, 304 U.S. 64, 81 (1938).  Under Pennsylvania law, "[t]he construction of an insurance policy is a question of law which must be resolved by the courts."  Hunyady v. Aetna Life & Cas., 578 A.2d 1312, 1313 (Pa. Super. Ct. 1990).  When interpreting the insurance contract, "the goal of [the] task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument." Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C., 821 F.2d 216, 220 (3d Cir. 1987) (citing Mohn v. American Cas. Co. of Reading, 326 A.2d 346 (Pa. 1974)).  Additionally, "[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement."  Id.  If the language is clear and unambiguous, however, a court is required to give effect to that language.  Pennsylvania Mfrs'. Ass'n Ins. Co. v. Aetna Cas. & Sur. Ins. Co., 233 A.2d 548, 551 (Pa. 1967).  In

determining whether a provision in an insurance policy is ambiguous, the test is whether "reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning." Celley v. Mutual Benefit Health & Accident Ass'n, 324 A.2d 430, 434 (Pa. Super. Ct. 1974).  Thus, "[t]he fact that the parties do not agree upon the proper interpretation does not necessarily render the contract ambiguous." Vogel v. Berkley, 511 A.2d 878, 881 (Pa. Super. Ct. 1986).  Additionally, in St. Paul Fire & Marine Ins. Co. v. U.S. Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981), the court stated that "[a] court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them."  As a result, "the Court [should] adopt the interpretation which, under all the circumstances of the case, ascribes the most reasonable, probable and natural intention of the parties, bearing in mind the objects manifestly to be accomplished." Galvin v. Occidental Life Ins. Co. of Cal., 211 A.2d 120, 122 (Pa. Super Ct. 1965).

### C.  The Policy Provision Concerning Damage Due to "Collapse"

Defendant's principal argument advanced in its brief in support of its summary judgment motion is that its loss is specifically covered by the provision for damage caused by "collapse." (Def.'s Br., Dkt. Entry 25, at 6-7.)  Section D of the part of the Policy, titled "Causes of Loss – Special Form," provides coverage for "Collapse."  (Policy, Dkt. Entry 22, Ex. A, at 34.)  Collapse is defined as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (Id.)

8

Defendant claims that the door on the east side of the property "collapsed," as that term is used in the Policy.  (Def.'s Br., Dkt. Entry 25, at 6.)

The Policy, however, affords coverage only if collapse is caused by a specific event.[2]

─────────────────

[2]The Policy provides coverage if the collapse is caused by one of the following:

a.  The "specified causes of loss" or breakage of building glass . . .

b.  Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

c.  Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

d.  Weight of people or personal property;

e.  Weight of rain that collects on a roof;

f.  Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation.  However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **2.a.** through **2.e.** we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation contributes to the collapse.

The "specified causes of loss" referenced in paragraph 2a are defined as follows:

Fire; lightening; explosions; windstorm or hail; smoke; aircraft or vehicle; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

"Water damage" is defined to mean "accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts) that

Defendant argues that the covered causative factor here is the "[u]se of defective material or methods in construction, remodeling or renovation . . .," contending that there was a defect in the materials or methods used in constructing the sewer pipe that failed in the embankment above the bowling alley.

The Policy, however, affords coverage only if the use of defective material or methods in construction, remodeling or renovation cause a collapse to occur "during the course of the construction, remodeling or renovation." (Policy, Dkt. Entry 22, Ex. A, at 34.) Defendant concedes that the "collapse" at issue in this case did not occur during the course of construction, remodeling or renovation. Morever, it is evident that none of the other covered causes of collapse is present here, and Defendant does not argue otherwise. (See Oral Argument Tr., Dkt. Entry 32, at 2-5, 13-14.) Thus, the insured's reliance upon the collapse provision is misplaced.

### D. Interpretation of the Policy's Exclusions

As noted above, the Policy is essentially an "all-risk" policy.[3] Under an all-risk policy, "all

_____

is located on the described premises and contains water or steam."

(Policy, Dkt. Entry 22, Ex. A, at 34-35.)

[3] The "Covered Causes of Loss" section of the policy states: "A. Covered Causes of Loss. When Special is shown in Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is: 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations; that follow." (Policy, Dkt. Entry 22, Ex. A, at 29.) Though Defendant identified the policy as an all-risk policy in its Statement of Facts, TIC initially denied

losses are covered except for those specifically excluded." Spece v. Erie Ins. Group, 850 A.2d 679, 683 (Pa. Super. Ct. 2004).  "Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense, and accordingly, bears the burden of proving such defense." Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (citations omitted).

TIC contends that Defendant's claim is excluded on the basis of the earth movement and water exclusions, in conjunction with the lead-in clause to the Exclusions section of the Policy.  Specifically, Defendant asserts that the damage at issue is not covered by the Policy because it was caused "at least in part, by earth movement and water within the meaning of the policy exclusions."  (Pl.'s Reply Br., Dkt. Entry 29, at 1.)  Defendant counters by arguing that coverage remains available if the damage was proximately caused by a non-excluded event or factor, even if an excluded event or factor contributed to the damage.

### 1.  The Lead-In Clause to the Policy's Exclusion

Defendant's argument conflicts with the lead-in clause to the Policy's Exclusions section. The lead-in clause states: "[w]e will not pay for loss or damage **caused directly or indirectly**

_____

this description of the Policy in its response.  (Def.'s SMF, Dkt. Entry 26, at ¶ 7; Pl.'s Response, Dkt. Entry 28, at ¶ 7.)  In so doing, TIC characterized the policy as one that "provides coverage for risks of direct physical loss unless excluded or limited."  (Pl.'s Response, Dkt. Entry 28, at ¶ 7.)  TIC's characterization of the policy is effectively the definition of an all-risk policy.  At oral argument, TIC's counsel acknowledged that the Policy could be considered an all-risk policy. (Oral Argument Tr., Dkt. Entry 32, at 5-6.)

by any of the following [enumerated exclusions].  Such loss or damage is excluded **regardless of any other cause or event that contributes concurrently or in any sequence to the loss.**" (Policy, Dkt. Entry 22, Ex. A, at 29; emphasis added.)  Read literally, the lead-in clause precludes coverage of a loss so long as a specifically enumerated exclusion contributed in some way to the loss.[4]  Under this literal interpretation of the lead-in clause, the degree to which an excluded factor contributed to the loss is irrelevant.  Thus, for example, if surface water contributed to the damage, coverage would be excluded.

Defendant asserts that Pennsylvania law nonetheless directs that coverage be recognized despite the application of an expansive lead-in clause, citing Spece v. Erie Ins. Group, 850 A.2d 679 (Pa. Super. 2004).  In Spece, the Pennsylvania Superior Court examined an all-risk policy with a broad lead-in clause in its exclusions section.[5]  In Spece, lightning struck a transformer away from the insured's property, resulting in power outage at the insured's property. Id. at 681.  The power outage in turn suspended operation of the sump pump at the insured property, leading to interior water damage of the insured's home.  Id.  The policy did not exclude coverage for lightning strikes.  Furthermore, while the policy excluded coverage for a power interruption taking place away from the premises, it provided coverage for

---

[4] Defendant acknowledged at oral argument that, if read literally, the lead-in clause would bar coverage here.  (Oral Argument Tr., Dkt. Entry 32, at 15.)

[5] The lead-in clause in Spece stated: "We do not pay for loss resulting directly or indirectly from any of the following, even if other events or happenings contributed concurrently, or in sequence, to the loss."  Spece, 850 A.2d at 682-83.

"loss caused by a power interruption occurring on the residence premises."  850 A.2d at 683.

The court found that power was indeed interrupted on the insured premises, thus affording a

basis for recovery for the loss caused by that power interruption.  The court also found an

ambiguity between the coverage provision for power outages and the exclusion for a sump

pump failure, suggesting that it was reasonable to conclude that a sump pump that failed due to

a power interruption on the insured's premises would be covered.  Id. at 684.  As to the effect of

the lead-in clause, the court held that it would operate to exclude coverage only "if an

exception, in its entirety, applies . . . ."  Id.  Finding that the exceptions concerning sump pump

failures and power interruptions did not apply due to the ambiguity the court had found with

respect to a power interruption on the premises that causes a sump pump failure, the court held

that the lead-in clause was not applicable.  Id.  Stated otherwise, the court found that the

exclusions on which the insurance company relied did not apply to the loss sustained as a

result of the power interruption.  If an enumerated exclusion is inapplicable, as was the case in

Spece, then, of course, the lead-in clause is irrelevant.

     Defendant asserts that Spece stands for the proposition that the "efficient proximate

cause" doctrine serves to overrule the lead-in clause.  (Oral Argument Tr., Dkt. Entry 32, at 9-

10.)  The efficient proximate cause in this case, claims Defendant, was the defectively-installed

sewer pipe in the embankment above the bowling alley.  (Id. at 11.)

     The proximate cause analysis in insurance coverage disputes was explained by one

13

court as follows:

> [W]hen the loss is caused by a combination of a covered and specifically excluded risk, the loss is covered if the covered risk was the efficient proximate cause of the loss.  No coverage exists for a loss if the covered risk was only a remote cause of the loss, or conversely, if the excluded risk was the efficient proximate cause of the loss.  The efficient proximate cause is the risk that sets the others in motion.  It is not necessarily the last act in a chain of events, nor is it the triggering cause.  The efficient proximate cause doctrine looks to the quality of links in the chain of causation.  The efficient proximate cause is the predominating cause of the loss.

Murray v. State Farm Fire & Casualty Co., 509 S.E.2d 1, 12 (W. Va. 1998).

Significantly, Spece does not refer to the efficient proximate cause doctrine.  Thus, Spece does not stand for the proposition presented by Defendant at oral argument.

Defendant also argues that the Pennsylvania Superior Court applied the efficient proximate cause doctrine in Raybestos-Manhattan, Inc. v. Industrial Risk Insurers, 433 A.2d 906  (Pa. Super. 1981), in determining coverage for a loss caused by both included and excluded perils under an all-risk policy.  Although the Superior Court did engage in proximate cause analysis in Raybestos-Manhattan, the terms of the policy in that case were markedly different from the lead-in language to the Exclusion section in the TIC Policy. The policy in Raybestos-Manhattan provided that the insurer did not cover "loss caused by or resulting from . . . contamination . . .   unless such loss is caused directly by physical damage to the property covered, or to premises containing such property, by a peril not excluded in this policy."  Id. at

14

907 (emphasis added).  Thus, the all-risk policy in <u>Raybestos-Manhattan</u> afforded coverage if a

covered risk directly caused the loss, regardless of whether an excluded risk was a contributing

factor in bringing about the total loss.  Thus, in <u>Raybestos-Manhattan</u>, the policy terms called

upon a court to determine whether a covered risk was a proximate cause of the loss.

<u>Raybestos-Manhattan</u>, therefore, does not support a conclusion that Pennsylvania law

embraces the "efficient proximate cause" doctrine notwithstanding a policy term that negates

the analysis contemplated by such doctrine.

        Although there does not appear to be any decision of the Supreme Court of

Pennsylvania directly on point, courts in other jurisdictions have held that the efficient

proximate cause doctrine does not apply in the face of an expansive qualifying lead-in clause,

like that found in this case.  For example, in <u>Kane v. Royal Ins. Co. of America</u>, 768 P.2d 678,

685 (Colo. 1989), the Supreme Court of Colorado, in rejecting application of the efficient

proximate cause doctrine in circumstances similar to that presented here, stated that

"[a]lthough loss from third party negligence is covered under an all risk policy, that coverage is

expressly subject to the language of the exclusions included in the policy."[6]  <u>Id.</u>  The court went

on to hold that plaintiff's claim that water damage was covered because third-party negligence

_____

        [6] The court referred to the doctrine as the "efficient moving cause" rule, explaining that in
a case where there was more than one cause of a loss, coverage is allowed if a covered risk is
the "efficient cause" of the loss.  <u>Id.</u> at 684.  This is the equivalent of the "efficient proximate
cause" doctrine.

caused a dam to fail, resulting in the flooding of plaintiff's premises, could not be sustained in light of the policy provision that excluded damage caused by flood, "'regardless of the existence of any other contributing cause.'" Id.  The court observed that "the 'efficient moving cause' rule must yield to qualifying or enlarging words agreed to by the parties and included in the insurance policy." Id.

A similar result was reached in Chase v. State Farm Fire & Cas. Co., 780 A.2d 1123, 1130-31 (D.C. 2001), where the court explained:

> The efficient proximate cause doctrine is a default rule which gives way to the language of the contract.  The State Farm policy unambiguously dictates that proximate causation rules are not to be followed in connection with the earth movement exclusion.  The lead-in paragraph to that exclusion addresses the issue explicitly.  That paragraph excludes from coverage "any loss which would not have occurred in the absence of" earth movement.  The exclusion applies "regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss . . . ."  In other words, if earth movement was a contributing cause of the loss of Chase's property, the policy does not cover that loss – even if earth movement was not the (efficient) proximate cause and there were more dominant causes involving covered risks.  The causation language in the introduction to the earth movement exclusion is clearly intended to supplant the efficient proximate cause doctrine.

The language of the lead-in clause in the TIC Policy, by stating that any loss caused directly or indirectly by an enumerated exclusion is excluded "regardless of any other cause or event that contributes concurrently or in any sequence to the loss," by definition negates the efficient proximate cause doctrine.  Id.; Accord TNT Speed & Sport Center, Inc. v. American States Ins. Co., 114 F.3d 731, 733-34 (8th Cir. 1997) (efficient proximate cause doctrine

rendered inapplicable by policy language identical to that represented here); Assurance Co. of America v. Jay-Mar, Inc., 38 F. Supp. 2d 349, 354 (D. N.J. 1999) (same).  Under Pennsylvania law, the unambiguous terms of an insurance policy are to be enforced as written.  See Pennsylvania Mfrs'. Ass'n, 233 A.2d at 551.  Accordingly, the efficient proximate cause doctrine is inapplicable here.

As noted above, the Pennsylvania Superior Court in Spece did hold, however, that a lead-in clause is effective to preclude coverage only if an exclusion applies "in its entirety . . . even if other events contributed to the loss."  850 A.2d at 684.   Accordingly, it must be determined whether either the Policy's earth movement or water exclusion applies in its entirety to the instant case.

## 2.  The Earth Movement Exclusion

TIC asserts that the damage at issue is excluded from coverage because it was at least caused in part by an earth movement – landslide in this instance – within the provisions of the earth movement exclusion.  (Pl.'s Br., Dkt. Entry 23, at 12-13.)  It is undisputed that the embankment behind the bowling alley collapsed, blocking the natural flow of storm water runoff that ultimately resulted in the mud and water damage to the bowling alley.  (NFC Report, Dkt. Entry 22, Ex. C, at 10; Def.'s SMF, Dkt. Entry 26, at ¶¶ 11, 12.)  Furthermore, it is undisputed that the embankment collapse was proximately caused by the rupture of the sewer pipe. (Def.'s SMF, Dkt. Entry 26, at ¶¶ 10, 11;  Pl.'s Response, Dkt. Entry 28, at ¶ 8.)

The Supreme Court of Pennsylvania has held that the earth movement exclusion of an all-risk insurance policy bars coverage for "damage (loss) from earth movement due to natural events only." Steele v. Statesman Ins. Co., 607 A.2d 742, 743 (Pa. 1992).[7]  The Third Circuit had earlier found that, under Pennsylvania law, the earth movement exclusion of an insurance policy was "meant to deny coverage for spontaneous, natural, catastrophic earth movement, and not movements brought about by other causes."  Peters Township Sch. Dist. v. Hartford Accident & Indemnity Co., 833 F.2d 32, 35 (3d. Cir. 1987).[8]

The Third Circuit arrived at its decision by adopting the reasoning presented in Wyatt v. Northwestern Mutual Ins. Co., 304 F. Supp. 781, 782-83 (D. Minn. 1969), where the court wrote:

_____

[7]In pertinent part, the earth movement exclusion in Steele stated:

> We do not cover loss resulting directly or indirectly from:
>
> . . .
>
> Earth Movement. Meaning any loss caused by, resulting from, contributed to or aggravated by earthquake; landslide; mudflow; [or] earth sinking, rising or shifting: . . . .

Steele, 607 A.2d at 742-743.

[8] In Peters Township, the policy in question stated: "This policy does not insure under this form against: . . . D) Loss caused by, resulting from, contributed to or aggravated by any of the following:1. Earth movement, including but not limited to earthquake, landslide, mud-flow, earth sinking, earth rising or shifting."  Peters Township Sch. Dist., 833 F.2d at 33.

> [T]he reason for the insertion of the exclusionary clause . . . in all risk insurance policies is to relieve the insurer from occasional major disasters which are almost impossible to predict and thus to insure against.  There are earthquakes or floods which cause a major catastrophe and wreak damage to everyone in a large area rather than on individual policyholders. When such happens, the very basis upon which insurance companies operate is said to be destroyed.  When damage is so widespread no longer can insurance companies spread the risk and offset a few or the average percentage of losses by many premiums.
>
> . . . [T]he exclusionary language . . . was designed and intended to exclude from coverage  damage from natural causes and natural phenomena; i.e., earthquake, landslides, mudflow and other similar occurrences.  But where the proximate and efficient cause of damage definitely is the action of a third party, this exclusion does not apply even though the actions of such third-party may have incidentally caused some "earth movement."

304 F. Supp. at 782-83.

In Steele, damage to the insured's home was caused by the collapse of a hillside shared with a neighbor due to excessive construction by that neighbor.  Steele, 630 A.2d at 742.  The fact that earth movement caused the damage in question, however, was not sufficient in and of itself to warrant application of the earth movement exclusion.  Rather, in Steele, the court found the earth movement exclusion to be ambiguous because, on the one hand, it barred coverage for natural events, e.g., earthquakes, and on the other hand, barred coverage for events that could be natural or man-made, e.g., landslide.  Id. at 743.  This ambiguity required that he policy be interpreted to afford coverage where the earth movement was man-made.  Id.

In Steele, the Court found that the earth movement exclusion did not cover the damage to the insured's home because the landslide, the earth movement at issue, had been caused by

a man-made event – construction on adjoining property.  Id.  TIC's policy suffers from the same

drafting deficiency identified in Steele: the Policy is not clear in extending the earth movement

exclusion to man-made causes as opposed to natural events like an earthquake.  Id.  Applying

the reasoning in Steele and Peters Township School District, the damage to Defendant's

bowling alley would not be excluded by the earth movement exclusion of the Policy if the

collapse of the embankment was caused by a man-made event.

It is undisputed that the collapse of the embankment was proximately caused by failure

of the sewer pipe.  (Pl.'s Response, Dkt. Entry 28, at ¶ 8.)  In fact, TIC's expert, Mr. Haider,

concluded that "the slope failure cannot take place prior to the failure of the drainage pipe."

(NFC Report, Dkt. Entry 22, Ex. C. at 22.)[9]  What is disputed, however, is the cause of the pipe

failure that caused the earth movement in question.  The insured's expert asserts that faulty

construction caused the collapse of the embankment, while TLC's expert claims that the

enormous volume of water caused the joints in the drainage pipe to fail.  The insured,

attempting to fall within Steele, claims that the collapse of the embankment was due to a man-

made cause, i.e.,  faulty pipe installation, while TLC says a natural phenomenon, torrential rain,

_____

[9] Mr. Haider further elaborated by stating that "rupture of the corrugated metal
pipe triggered local liquefaction and scour of the earth materials that eventually
caused the embankment to collapse."  Id.  Defendant's expert, Mr. Schimmel, similarly
explained that "[t]he pressure buildup from the exfiltrated water during the heavy rainfall caused
the unstable [bedding and backfill] material to collapse and fall toward the bowling
establishment."  (Quad3 Report, Dkt. Entry 22, Ex. E, at 5.)

was the cause.  This dispute cannot be resolved on a summary judgment motion.  Accordingly, neither TLC nor Defendant is entitled to judgment as a matter of law on the applicability of the earth movement exclusion.

### 3.  The Exclusion for Damage Caused by Water

The Policy contains an exclusion for damage caused by "water."  (Policy, Dkt. Entry 22, Ex. A, at 30.)  Specifically, the policy states that TLC "will not pay for loss or damage caused directly or indirectly by . . . [f]lood, surface water, . . . overflow of any body of water . . .; [m]udslide or mudflow; [or] [w]ater that backs up or overflows from a sewer drain or sump . . . ." (Policy, Dkt. Entry 22, Ex. A, at 29-30.)  The Policy further provides that "[s]uch loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  (Id. at 29.)  The dispositive issue here, therefore, is whether the loss in question was caused by any of the manifestations of water damage set forth in the Policy's Exclusions section.

It is doubtful that the event in question would be recognized as a "flood" for purposes of the water exclusion in the TIC policy.  In this regard, flood waters "are those waters above the highest line of the ordinary flow of a stream, and generally speaking they have overflowed a river, stream, or natural water course and have formed a continuous body with the water flowing in the ordinary channel.'"  O'Neill v. State Farm Ins. Co., Civ. A. No. 94-3428, 1995 WL 214409, at *2 (E.D. Pa. Apr. 7, 1995)  Neither party asserts that the water that entered the

bowling alley originated from a waterway.  Accordingly, the flood exclusion does not appear to be applicable.  Nor do the exclusions for mudslide, mudflow, water backing up from a sewer drain or sump, or water overflowing a body of water appear to be applicable here.

The Policy, however, also excludes coverage for damage caused by "surface water."  As explained by the Pennsylvania Superior Court, surface waters are "commonly understood to be waters on the surface of the ground, usually created by rain or snow, which are of a casual or vagrant character, following no definite course and having no substantial or permanent existence."  Richman v. Home Ins. Co. of N.Y., 94 A.2d 164, 166 (Pa. Super. Ct. 1953) (citation omitted).  This definition is consistent with that applied by courts in other jurisdictions addressing the question of whether a loss has been caused by "surface water." See, e.g., O'Neill, 1995 WL 214409, at *3 ("Surface water is water which has 'diffused over the surface of the ground,' and is derived from falling rain or melting snow.'"); Thorell v. Union Ins. Co., 492 N.W.2d 879, 883 (Neb. 1992) (same); Heller v. Fire Ins. Exch., 800 P.2d 1006, 1008-09 (Colo. 1990) (same); State Farm Fire & Casualty Co. v. Paulson, 756 P.2d 764, 768-72 (Wyo. 1998) (collecting cases and concluding that "surface water" is not an ambiguous term, but plainly means "water on the surface, other than in streams, lakes and ponds."); Valley Forge Ins. Co. v. Hicks Thomas & Lilienstern, L.L.P., 174 S.W.3d 254, 258 (Tex. Ct. Of App. 1st Div. 2004) ("'surface water is generally defined as that which is derived from falling rain . . . and is diffused over the surface of the ground . . . .  Such waters are not divested of their character as surface

waters by reason of their flowing from the land on which they first make their appearance onto lower land in obedience of the law of gravity.'").

In the present case, the parties differ concerning the nature and origin of the surface water that contributed to the damage of the bowling alley.  TIC contends that surface water "from the [east] parking lot, downslope from the roadway embankment, and from the grassed area between the building and the parking lot" contributed to the water that entered the bowling alley.  (NSC Report, Dkt. Entry 22, Ex. D, at 10.)  In contrast, Defendant argues that, given the manner in which the parking lot is sloped, the surface water from the parking lot "did not contribute significantly to the inundation of the low area on the east side of the building." (Quad3 Report, Dkt. Entry 22, Ex. E, at 6.)  This dispute misapprehends the nature of "surface water."  All the water that accumulated outside the east side of the building, to a height of more than four feet, constituted "surface water," i.e., water that had accumulated there because of the heavy rain and the diverted flow of the surface water.  Thus, the dispute as to the source of the surface water that inundated the bowling alley is immaterial.  What is indisputable is that water which had accumulated outside the bowling alley was derived from torrential rains that hit the Pottsville area on July 11th and 12th, and this "surface water" ultimately flooded the interior of the bowling alley.

It is thus evident that the damage to the bowling alley was caused by "surface water," whether it came from the parking lot or from the embankment south of the building.  Courts

have consistently held that rainfall that collects outside a building and subsequently flows into that building is "surface water" for purposes of the surface water exclusion.

For example, in Richman, supra, the Pennsylvania appellate court ruled that it was proper to infer that damage to the interior of a clothing store was caused by "surface water," where the evidence showed that several feet of water had accumulated in a low-lying area immediately adjacent to the flooded store.  The court, finding that the term "surface water" was not ambiguous, sustained the judgment in favor of the insurer.  94 A.2d at 165-66.

In Paulson, supra, the Supreme Court of Wyoming addressed the question of whether damage to a residence that occurred when water flooded a basement through windows broken during a hail and rain storm was covered by a policy that excluded loss from surface water, and which further provided that coverage was foreclosed "'regardless of: (a) the cause of the [surface water]; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the [surface water] to produce the loss'."  756 P.2d at 765.  Rejecting the trial court's determination that there was a "latent" ambiguity in the policy's use of the terms "rain," "flood," and "surface water," the high court of Wyoming concluded:

> At least some of the water which entered [the] basement had diffused over the surface of the ground, was derived from falling rains, and had not reached a well-defined channel, lake or pond.  It fit other plain meanings of surface water. . . . The evidence established the fact that this kind of water entered the basement and caused the damage.  There was no evidence to the contrary.  Thus, a contrary finding could not be made.

Id. at 768.

The Wyoming Supreme Court's reasoning was adopted by the Supreme Court of Nebraska in Thorell, supra. In Thorell, a basement was flooded after a board crashed through a large window during a severe wind and rain storm. The all-risk homeowners policy excluded loss caused by surface water, "regardless of any other cause or event contributing concurrently or in any sequence to the loss." 492 N.W.2d at 882. Rejecting the trial court's determination that there was some ambiguity in the policy, the Nebraska Supreme Court directed that judgment be entered in favor of the insurer, explaining:

> The evidence is uncontroverted that on the night in question, heavy rain fall caused a large volume of water to collect within an area circumscribed by an earthen berm west of the Thorell home. A broken window allowed this diffused water to flow into the basement to a depth of 4 feet. When the water receded, it left four inches of mud on the basement carpeting. From the evidence in this case, reasonable minds can draw but one conclusion as to the type of water that damaged the Thorells' home and personal possessions. It was surface water, not rain. Surface water damage to both the dwelling and the contents is a risk that is excluded from coverage by the express terms of the . . . insurance policy . . . . Therefore, [the insurer] was entitled to a directed verdict as a matter of law.

Id. at 884.

An identical conclusion is compelled here. There is no dispute that a large volume of water accumulated to a depth of more than four feet outside the door on the east side of the bowling alley. There is also no dispute that water rushed into the bowling alley when the door on the east side collapsed from the hydrostatic pressure of the accumulated water and debris. Reasonable minds in this case can only draw one conclusion, and that is that the damage to the bowling alley was caused by surface water.

Unlike <u>Spece</u>, there is no ambiguity in the policy at issue that would suggest that the exclusion for damage caused by surface water is ambiguous.  The exclusion for surface water damage, coupled with the lead-in clause, unambiguously bars recovery here.

That is, in this case, it must be concluded that the damage in question was caused, directly or indirectly, by surface water.  That a covered risk may have contributed to the loss is irrelevant in light of the clear language of the lead-in clause. <u>See</u> Valley Forge Ins. Co., 174 S.W.3d at 258-59 (surface water exclusion coupled with lead-in clause similar to that at issue here compelled judgment in favor of insurer).  Indeed, Spece recognized that recovery under an insurance policy would be foreclosed by the combination of a lead-in clause and an exclusion that applied "in its entirety . . . even if other events contributed to the loss."  850 A.2d at 684. The surface water exclusion does apply in its entirety.  Therefore, although there is a jury question concerning the applicability of the earth movement exclusion, the surface water exclusion and the lead-in clause unambiguously combine to exclude the loss at issue from coverage under the Policy.

## III.  <u>CONCLUSION</u>

It is indisputable that surface water flowed into Defendant's bowling alley to a depth of more than three feet.  Unlike the policy in <u>Spece</u>, which was found to be ambiguous with respect to exclusions concerning damage caused by power interruption and sump pump failure, there is nothing ambiguous with respect to TIC's exclusion for damage caused by surface

water.  Furthermore, the fact that there is a jury issue as to what caused the earth movement, which in turn caused the water to back up and ultimately knock down the east door to the bowling alley, does not defeat application of the exclusion.  The Policy bars recovery from an excluded cause, i.e., surface water, whether the excluded factor caused the loss directly or indirectly, and regardless of "any other cause or event that contribute[d] concurrently or in any sequence to the loss." (Policy, Dkt. Entry 22, Ex. A at 29.)  Thus, even if a covered landslide caused the disruption of normal drainage such that the hydrostatic pressure of accumulated surface water broke down the bowling alley door, coverage is nonetheless precluded. Accordingly, TIC's summary judgment motion will be granted, and Defendant's summary judgment motion will be denied.[10]  An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

---

[10]While this ruling necessarily means that Defendant cannot recover on its contractual and statutory bad faith counterclaims, it may not necessarily foreclose Defendant's counterclaim for fraud.  Accordingly, a telephonic status conference will be scheduled.

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **T.H.E. INSURANCE COMPANY,** | : | |
| | : | |
| **Plaintiff** | : | |
| **VS.** | : | **3:CV-04-1652** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **CHARLES BOYER CHILDREN'S TRUST** | : | |
| **D/B/A BOYER'S WESTWOOD LANES,** | : | |
| **Defendants** | : | |

## ORDER

**NOW, THIS 11th DAY OF OCTOBER, 2006,** for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for summary judgment (Dkt. Entry 21) is **GRANTED**.

2. Defendant's Motion for summary judgment (Dkt. Entry 24) is **DENIED**.

3. A telephonic status conference will be held on Thursday, October 26, 2006, at 2:00

p.m.  Counsel for plaintiff is responsible for placing the call to (570) 207-5720 and all counsel

shall be ready to proceed before the undersigned is contacted.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge
